Thomas L. CICERO and Marlene Cicero, Plaintiffs,

v.

BORG–WARNER AUTOMOTIVE, INC., a Delaware corporation, and Borg–Warner Automotive Automatic Transmission Systems Corporation, a Delaware corporation, Defendants.

No. 98–CV–71612–DT.

United States District Court, E.D. Michigan, Southern Division.

Sept. 24, 2001.

---

**32.** David Herrington is representing Grisel in this action.

Michael V. Kell, Margaret A. Lynch, Kell & Lynch, Birmingham, MI, for Plaintiffs.

Thomas L. Fleury, Detroit, MI, for Defendants.

***ORDER AWARDING COSTS TO DEFENDANTS; ORDER DECLINING TO IMPOSE SANCTIONS ON PLAINTIFF [1] OR PLAINTIFF'S COUNSEL***

CLELAND, District Judge.

## I. Introduction

On November 23, 1999, the court granted defendants' motion for summary judgment and ordered defendants to file a motion and brief within two weeks if they sought costs and fees pursuant to Fed. R.Civ.P. 54. *See Cicero v. Borg–Warner Automotive, Inc.,* 75 F.Supp.2d 695, 711 (E.D.Mich.1999). On the same day, the court issued a separate order for plaintiff Thomas Cicero and his attorneys to show cause why they should not be sanctioned in light of the apparent meritlessness of plaintiffs' claims, as explained in the order granting summary judgment.

Defendants filed their "Brief in Support of Fees & Costs" on December 13, 1999, and plaintiff responded to that brief on December 23, 1999. Plaintiff and his counsel responded to the court's show cause order on December 9, 1999, and filed a supplemental brief on January 3, 2000. In addition, plaintiff and his attorneys also separately submitted affidavits by two people, Lawrence Dubin and Donald Gasiorek, offered, apparently, as expert testimony as to the reasonableness of Mr. Cicero's attorneys' actions. The court held a hearing concerning the appropriateness of sanctions on August 9, 2000.

## II. Costs

Rule 54(d) of the Federal Rules of Civil Procedure provides that "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Defendants aver that as a result of Mr. Cicero's suit, they incurred deposition transcript and court reporter fees totaling $5,985.05; travel costs totaling $1,925.31; and other costs (such as photocopying, electronic legal research, and

1. Marlene Cicero was not subject to the order because her loss of consortium claim was purely derivative of her husband's discrimination claim.

postage) totaling $2,229.69. *See* 12/13/99 Fleury Aff. at ¶¶ 7, 8, and 10. While plaintiffs' response to defendants' brief vigorously contested the suitability of an attorney fees award, plaintiffs did not challenge either defendants' legal entitlement to cost reimbursement or the reasonableness of any of the claims. Accordingly, plaintiffs have waived any such challenge. The court finds the bills and cost summaries proffered by defendants to be reasonable, and accordingly awards defendants $10,140.05.

### III. Sanctions

Having reviewed the extensive arguments and evidence presented by both parties in response to the show cause order, as well as the extensive case law summarized therein, the court will address several (though not all) of the issues raised in response to the sanctions issue.[2]

■ At the outset, the court notes that there are no facts before it suggesting that Mr. Cicero's attorneys should be sanctioned for filing the complaint that initiated this suit. In a fact-intensive area such as employment discrimination, determining the prospective reasonableness of a client's claims prior to filing the lawsuit is fraught with difficulty. Attorneys are often presented with clients who possess a view of the situation that is (understandably) biased, and little else. Not until a complaint is filed will an attorney have the mechanisms of compulsory discovery available to him that might permit more complete view of the case and an informed evaluation of his client's claims. Moreover, a statute of limitations may create urgency to file a complaint so that an attorney may protect the viability of his client's claims before he has had a full opportunity to evaluate their merits. This is not to say that there is no such thing as an unreasonable filing of an employment discrimination complaint. There is, however, no evidence before the court indicating that Mr. Cicero's attorneys were acting unreasonably at the time they filed this suit on his behalf.

■ The court also finds no bad faith on the part of plaintiff's counsel in prosecuting this case. Indeed, their conduct, with respect to their client's interests, appears to reflect the degree of professionalism expected of members of the bar. Nor does it appear that counsel engaged in any behavior that might be construed as intentionally vexatious. The court's conclusion that this suit should have been terminated sometime shortly after Mr. Cicero's deposition remains unchanged, but that is not dispositive of the sanctions issue under the circumstances of this case. Importantly for purposes of this decision, the court notes that at no time did defendants request sanctions of plaintiff or his counsel, or invoke the "safe harbor" provisions of Rule 11 to put opposing counsel on notice that plaintiff's legal claims were unsustainable. Had such measures been taken, the imposition of sanctions would be more strongly considered.

The court further notes the commendable manner in which plaintiff's counsel have responded to the court's concerns. It is no easy task for zealous advocates to both defend the legitimacy of their actions and deferentially respond to judicial conclusions inimical to their and their client's interests. Plaintiff's attorneys have been diligent in addressing those concerns, and it seems unlikely that any further deter-

---

**2.** The court need not address every issue, as it will decline to impose sanctions. In light of the frequency with which many of the issues raised in this litigation are raised in employment discrimination cases, the court believes that many of the issues may be of some concern to the bar generally.

rence is required beyond that which has undoubtedly been accomplished by this process.

### A. Plaintiff's Expert Witnesses

Plaintiff and his counsel proffered affidavits and resumes from Lawrence Dubin and Donald Gasiorek, as well as in-court testimony from Mr. Gasiorek, on the issue of whether plaintiff's counsel should be sanctioned. While not explicitly stated, it appears from the form and substance of the testimony that plaintiff proffered these individuals as experts to give opinions on the issue of what kinds of attorney conduct constitute "reasonable" actions in the prosecution of an employment discrimination suit. Because these individuals are presented as expert, not fact, witnesses, the admissibility and weight of their testimony must be analyzed according to FRE 702–705, as explained by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[3]

### 1. Lawrence Dubin

Plaintiff's counsel proffer the affidavit and resume of Mr. Lawrence Dubin, who opines that counsel were "properly discharging their professional responsibility to their clients by providing diligent representation," based on Mr. Dubin's interpretation of the Michigan Rules of Professional Conduct. 8/7/00 Dubin Aff. at ¶ 16. Mr. Dubin's resume indicates that he is a professor at the University of Detroit Mercy School of Law, and has been since 1975, as well as a "Legal Analyst" for WJBK–TV, the local Fox television network affiliate. Mr. Dubin's resume further indicates that he has published writings in numerous books, law reviews, journals, and newspapers; participated in various forums and television programs; taught several different legal subjects; been appointed to several positions within the legal community; is a member of several legal organizations; and has received numerous awards.

■ Despite Mr. Dubin's credentials, the court finds it difficult to determine whether he is qualified to testify as an expert in the ethical requirements of prosecuting an employment discrimination case in Michigan. For instance, the court notes that while Mr. Dubin is apparently well published, there is no indication that any articles were peer-reviewed. Unlike professions with a more technical bent, the court takes notice that an article in a law review is typically the product of only the author, and that it undergoes no more serious critique than the grammatical and citation checking done by the law students who run the journals and select the articles. Those students have neither obtained law degrees, been admitted to any bar nor actually practiced law. In most situations, newspaper articles, or commentaries in legal journals or on television are also similarly lacking in any sort of evaluation by one's peers in the area. Nor is it even enough that another attorney may have evaluated the piece, either before or after publication. Simply possessing a law degree does not make one an expert in all areas of the law, even if one's criticisms are insightful. In other words, without an indication that Mr. Dubin's articles on ethics and professional responsibility were subject to meaningful peer review by other experts in that area of law, his writings

---

**3.** The court is not certain whether there is such a thing as an "expert" in these areas; it may well be that the only sources of "expertise" are the courts and professional bodies charged with administering them. This issue was not raised, and remains unresolved for purposes of this order.

and commentaries are really no more than one lawyer's opinion.[4]

While holding a professorship at a local law school might create an imprimatur of expertise, holding that position does not, by itself, make one an expert in anything. Again, unlike in more technical professions, law professors are often considered and utilized as fungible instructors for the various subjects offered. Professor Dubin's resume indicates that he has taught six different classes, but that provides no information as to whether he maintains an up-to-date expertise in any of them. One need not be an expert in a particular subject to teach it in law school, though that is certainly desirable; the minimum requirement is only that one have enough familiarity with the subject to capably impart the necessary amount of it to students. This is not to say that Mr. Dubin does *not* possess such expertise, only that the court has been provided with insufficient information to make that determination.[5]

For the purposes for which Mr. Dubin's testimony is proffered the most significant part of his resume is the official appointments he has received to grievance and professionalism bodies. It seems likely to the court that Mr. Dubin's experience with these bodies, perhaps in tandem with the recognition such appointments imply, might qualify him as an expert. However, the court again lacks sufficient information to make that determination. No evidence is provided as to the criteria used to select the members of these bodies, the qualifications of the selectors, and whether their members must actually bear expertise in professional responsibility. Without further information, the court cannot accept at face value that Mr. Dubin's prior membership with these groups makes him an expert in these areas.[6]

In sum, insufficient information has been provided to the court concerning Mr. Dubin's qualifications to qualify him as an expert in the area of legal ethics and professional responsibility. The court thus disregards his affidavit, though some of the issues raised by Mr. Dubin may be addressed in other parts of this opinion.

## 2. Donald Gasiorek

■ Plaintiff's counsel also proffer the resume, affidavit, and in-court testimony of Donald Gasiorek as an expert in employment discrimination law. The court has concerns about Mr. Gasiorek's qualifications as an expert similar to those expressed about Mr. Dubin. To the extent the court's concerns about Mr. Gasiorek are the same to those of Mr. Dubin, the court need not further elaborate; to the

---

**4.** The same difficulty accrues from the awards given to Mr. Dubin; the only awards relevant to his qualifications as an expert in the field of legal ethics would be those awarded on the basis of evaluations of others who themselves possess expertise in legal ethics. Awards from law students or members of the bar at large simply does not indicate legal ethics expertise.

**5.** Similarly problematic is a decision as to the weight that should be given to Mr. Dubin's occupation as television "Legal Analyst." For instance, there is no indication as to what, if any, qualifications the decision-makers at the local Fox television station possess for selecting their "Legal Analyst," or what criteria are used in selecting such an individual. Nor is there any indication how holding such a position might contribute to the knowledge and expertise Mr. Dubin might bring to bear in the area of legal ethics.

**6.** By way of example, the court notes that in some states, laypersons are members of such grievance committees. It is unlikely (though by no means certain) that such a person would be expertly qualified to testify in court as to the requirements of legal ethics. Moreover, individuals are often appointed to such organizations because of their high standing in the relevant community, not because of their expertise.

extent the concerns differ, the court will address some of them here. First, the court notes that Mr. Gasiorek is a member of the employment-related committees of various local bar associations. While membership in these groups certainly implies an interest in this area of law, it does not necessarily connote expertise, as any attorney can select himself to be a member of these organizations.

■ Second, though Mr. Gasiorek is apparently listed in a publication called Woodward & White's *Best Lawyers in America*, there is no evidence demonstrating who the publication's decision-makers are, their qualifications, or what criteria are used.

■ Third, and most perplexing (but by no means the fault of Mr. Gasiorek or plaintiff's counsel), is the extent to which the court should give weight to "experience" as a criterion for qualifying an attorney as an expert in a particular area of law. Mr. Gasiorek avers that he has practiced in employment law since 1981, and that he currently practices almost exclusively in that area. He also avers that he frequently represents both plaintiffs and defendants in employment discrimination cases. The court is not at all sure that time in service leads to expertise.[7]

Nonetheless, assuming without deciding that Mr. Gasiorek is an expert in the field of employment discrimination law, the court will address some of the issues raised in his testimony.

■ First, Mr. Gasiorek observed that Mr. Cicero's case is precisely the kind of case that an employment discrimination attorney would consider meritorious and likely file. As previously observed in this order, there appears to be no difficulty with the attorneys' actions in filing this suit (though, as will be discussed later, Mr. Cicero's individual decision to bring it is more problematic). The difficulty arises in the continued prosecution of the case once counsel obtained compelling factual evidence that their client's case was unsustainable. It is not enough, as Mr. Gasiorek has noted, that every employment discrimination case is fact-intensive and unique. The point is that there are many sets of facts that will not support a cause of action in law, and once an attorney becomes aware of them, he is obligated to withdraw the suit. It may be because suits brought under the employment discrimination statutes and in tort are fact-intensive and they are so plentiful on the dockets of the courts. Whether of not they are frivolous, the fact-intensive nature of such suits makes it virtually impossible for defendants to protect themselves from the expenditures required by the lawsuit, because no resolution can be obtained until summary judgment is available, after the cost of discovery has been incurred. The result is that these kinds of suits are often observed to have artificially high settlement value against defendants, who, in the absence of fee-shifting statutes, are economically better off settling the case than taking it to summary judgment or trial, no matter how unjustifiable the suit. If anything, the fact-intensive nature of employment discrimination and

---

7. One would hope that attorneys who practice in a particular area of law for many years would develop an expertise in that area, however, courts do sometimes encounter attorneys who have been practicing law not very well but for a great length of time. By noting this unfortunate reality, the court in no way suggests that Mr. Gasiorek is such an attorney, but only notes the limits of relying upon an attorney's time in practice as an indicator of expertise. Though plaintiff's counsel and Mr. Gasiorek were not presented with this question at the hearing, the court is of the view that something more than time in practice would be required to qualify an attorney as an expert in a given specialty.

tort suits *increases* the ethical obligation of attorneys representing plaintiffs to maintain an ongoing awareness of the validity of their clients' claims.

The absence of self-policing by a plaintiff's attorney creates the perverse incentive leading defendant's counsel to protect his client's pecuniary interests by moving for sanctions whenever, upon information and belief, he comes to the conclusion that the plaintiff's suit is without merit. As officers of the court, attorneys have obligations not just to their clients, but also to the court, their opponents, and society at large, to refrain not only from filing meritless lawsuits, but to refrain from prosecuting them once it becomes clear that they are without merit. In this case, no reasonable person could have believed that Mr. Cicero was the victim of age discrimination after hearing his deposition testimony, and the lawsuit should have been terminated shortly thereafter. That thousands of other such lawsuits are routinely brought and prosecuted does not make them more meritorious, or an attorney's conduct more reasonable in pressing them.

■ At two different points in his testimony at the hearing, Mr. Gasiorek opined that an inference of discrimination justifying a lawsuit could be drawn from (1) an employer terminating an employee without warning and a chance to improve; or (2) an employer overlooking repeated performance failures, because if the failures were significant, then the employer would have terminated the employee immediately. With these statements taken together, Mr. Gasiorek has testified that any termination creates an inference of unlawful discrimination.[8] This, though, is a contrived Hobson's choice: a "damned-if-you-do, damned-if-you don't" proposition that is not the state of the law, and never has been. Neither premise is true for at-will employment relationships, the employment relationship Mr. Cicero had with Borg–Warner. Similarly, Mr. Gasiorek observed that most large employers have formalized evaluation systems, whereby written reports and recommendations are generated concerning employee performance problems, with employees typically given time to improve. While it may be the case that most large employers do conduct their personnel operations in such a manner, such practices are irrelevant to the finding of an inference of discrimination.[9]

Michigan is an employment at will state. Mr. Cicero was employed at will. This means that he could be terminated at any time, for any reason, or for no reason at

8. This was Mr. Gasiorek's position at the hearing, notwithstanding his response to the court's query as to the circumstances under which a terminated member of a protected class would not have a viable discrimination suit. In summary form, his response was that individuals who conceded to their attorneys that they had been terminated for repeated, documented performance failures would probably not be viable candidates for discrimination suits. In other words, Mr. Gasiorek's position appears to be that only clients who admit to their attorneys that they were terminated for cause, and not discriminated against, can be characterized as pursuing frivolous discrimination suits. Under this logic, apparently, attorneys have no professional obligation to consider the evidence of a client's case as it develops, even if it becomes patently clear that there is no evidence of discrimination, and there is overwhelming evidence that the client was terminated for performance-based reasons. So long as the client does not explicitly admit that he was not discriminated against, the suit may be maintained. If this is indeed the witness's reasoning, it contravenes Rule 11, 28 U.S.C. § 1927, MRPC Rule 3.1, and common sense.

9. As explained below, there are some narrow factual circumstances under which an employer's deviation from its own internal procedures might be of value in an employment discrimination case, but those circumstances did not exist in the instant case.

all, with or without explanation. The law affords Mr. Cicero the exact same benefit as that given his employer; he can quit at any time, for any reason, or for no reason at all, without explanation. Nor does the law impose any obligation whatsoever for an employer to provide a formalized evaluation process, or give an employee the right to an explanation of why an employer is dissatisfied with his performance. That an employer might choose to implement such procedures is for the employer's own benefit, but an employer is under no obligation to do so. There are two means by which such a system might be required, and whose absence might be of evidentiary value in a discrimination lawsuit: First, such a system could be required—such as by statute (e.g., the civil service system), regulation, or judicial decree (such as after a class action lawsuit in which a finding of systemic discrimination had been made). Second, it could be required by private contract, such as exists in the union context. Here, neither public nor private law required the implementation of a formalized evaluation system or an explanation to an employee, and the purported absence of either one is indicative of nothing more than the defendant lawfully exercising its prerogative to manage its internal operations in the fashion it chooses. One cannot, as Mr. Gasiorek suggests, draw an inference of unlawful discriminatory animus from an employer engaging in legally privileged conduct. The prevailing practice of "most large employers" is irrelevant: the increasing size of an employer does not transform activity from innocent to culpable. If Mr. Cicero wanted a legal right to be explicitly warned that he was not performing his job and might be terminated, he was free to negotiate a contract to that effect with his employer. He did not, and neither the absence of warnings as often as he would have liked nor his lack of understanding of the reason(s) for his termination are of any significance in establishing the occurrence of unlawful discrimination.

Mr. Gasiorek also stated that an employee such as Mr. Cicero, who did not understand, or who disagreed with, the reasons for his termination, would be justified in filing a discrimination suit because it is only through discovery that the evidence of discrimination could be obtained (or, to paraphrase Mr. Gasiorek, "it's the employer's evidence that's used to prove the discrimination"). This too, is not the law. What Mr. Gasiorek describes here would be known as a "fishing expedition." First, as previously noted, an employer is under no obligation to create documents evaluating at-will employee performance; the existence of such documents is a sheer fortuity that may be of aid to one or both parties in litigation. Because an at-will employee has no right to such evaluations, their non-existence is evidence of nothing.

More importantly, however, is that an employee needs more than dissatisfaction with his termination to file a discrimination suit. Though there may be employees who are happy about being fired, they are likely to be few and far between; nonetheless, at-will employees have no right to be employed by a particular employer. If a terminated employee wishes to file a discrimination lawsuit, he must have rational reasons that could reasonably support a conclusion that he was terminated *because* he was a member of the protected class, not just dissatisfaction at being fired, confusion as to the reason, and a hope that discovery will pull something out of the water that could be "spun" as evidence of invidious discrimination. The anti-discrimination laws exist for the important but narrow purpose of preventing employment decisions from being made on the basis of mindless prejudice against irrelevant and immutable characteristics, such as race,

gender, and age. They do not exist to provide an alternative means of unemployment compensation, to require employers to treat members of protected classes differently than other employees, or to effect transfers of wealth to the legal profession and disgruntled former employees.

Indeed, under the theory of discrimination proffered by Mr. Gasiorek and plaintiff's counsel, if Mr. Cicero had quit rather than being fired, Borg–Warner would have an even more viable factual case of age discrimination[10] against Mr. Cicero than Mr. Cicero had against Borg–Warner. Under plaintiff's theory of the facts—and assuming that any of Borg–Warner's shareholders, officers, managers, or employees fell within the over–40 protected class—Borg–Warner could sustain its lawsuit against Mr. Cicero because Mr. Cicero terminated the relationship without warning, because he failed to give Borg–Warner a chance to conduct its operations in a fashion to Mr. Cicero's liking, because Mr. Cicero during his two-and-a-half years of employment occasionally expressed satisfaction with its performance, and because Mr. Cicero left without creating copious contemporaneous records detailing the failures he found in the company. Of course, such a lawsuit would be laughable, but the humorous effect would be lost if Mr. Cicero was forced to spend $70,000 defending himself from such accusations.

While the court concurs entirely with Mr. Gasiorek's observation that discrimination lawsuits are routinely filed based on grounds similar to those proffered by Mr. Cicero and his attorneys, their frequency does not establish their reasonableness. The court believes that, in fact, the legal analyses proffered by Mr. Gasiorek provides an indication of how widespread the

misapprehension of employment discrimination law is in the legal community. The laudable causes of justice and anti-discrimination are actually undermined by the prosecution of the kinds of suits advocated by Mr. Gasiorek, such as that prosecuted on Mr. Cicero's behalf here.

The court finds Mr. Gasiorek has not established his expertise in the area of employment discrimination law, and will accord his testimony no weight.

## B. Whether the State of the Law Relied Upon by Plaintiff's Counsel Was Uncertain

In several ways, plaintiff's counsel suggest that the legal arguments proffered on Mr. Cicero's behalf were reasonable because the controlling law has been in a state of flux in recent years, or was otherwise unsettled. Though not controlling for purposes of considering the appropriateness of sanctions, it bears noting that plaintiff's counsel raised none of these arguments concerning the state of the law during the pendency of the case. The court will briefly address in turn each of the three areas of alleged flux:

### 1. "Qualification" and "Burden–Shifting" Under Michigan Law

Plaintiff's counsel make much of the fact that the Michigan Supreme Court's decisions in *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 568 N.W.2d 64 (1997) and *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906 (1998) were "fractured," purportedly leaving the state of the law "uncertain" to the "bench and bar." While it is certainly true that both cases resulted in more that one opinion from the presiding justices, neither case created any confusion as to the state of the law that was applica-

**10.** This hypothetical is purely imaginary and assumes an equality in the cause of action that does not exist, i.e., that an former employer could sue a former employee for age discrimination against it.

ble to Mr. Cicero's case. And though the principal would seem to be obvious, the binding interpretation of Michigan law is what a *majority* of the justices of the Michigan Supreme Court say it is.

In *Town*, the Court iterated the standard for when a plaintiff was "qualified" under Michigan law. In that case, the lead opinion signed by three justices held that the qualification issue should be considered in the *prima facie* case; the concurring opinion thought that issues of employee performance were better—though not always—considered in the second or third part of the usual tripartite analysis. But in both opinions, which constitute a majority of the Court and therefore the state of the law, it was clearly established that an employee must be meeting his employer's legitimate expectations to survive summary judgment. Indeed, this was the very standard that plaintiff's counsel proffered to this court during the summary judgment contest. Moreover, as was relevant to Mr. Cicero's position in this case, even the concurrence conceded that where the plaintiff put his job performance at issue, such issues were properly considered in the *prima facie* case. Regardless of where the qualification issue fits within the summary judgment analysis, the unequivocal evidence (as established by Mr. Cicero's deposition testimony alone) is that he was not meeting his employer's legitimate expectations—a status that is required to bring suit under the Elliot–Larsen Civil Rights Act.[11] Indeed, at no point did Mr. Cicero dispute the legitimacy of the expectations that he did not meet, a legal question that *was* arguably presented

by the split between the lead and concurring opinions in *Town*. And whatever the attractiveness of the dissenting justices' opinion(s) might be, it is not the law, and a federal district court sitting in diversity is without power to reconsider that view where it has been directly considered and determined by the highest tribunal of the state.

Similarly, while there were again multiple opinions presented in the *Lytle* case (which plaintiff's counsel did not even mention in summary judgment briefing), that case was cited by this court in its order granting summary judgment as being the then most current articulation of the tripartite burden-shifting test for age discrimination (as well as presenting the standard of comparing similarly-situated employees). For those propositions, at least five justices concurred with the lead opinion. Moreover, plaintiff's counsel again point to nothing in the differences among the Court's membership (amongst the majority or otherwise) that is applicable to Mr. Cicero's case.

Simply put, there was nothing unsettled about the state of the Michigan Supreme Court's case law that made Mr. Cicero's position legally ambiguous; he was not qualified, and it was simply not possible for him to meet the evidentiary burdens required of him under the Michigan Supreme Court's binding construction of the law.

### 2. Federal Cases Applying the Burden–Shifting Standard

In *Reeves v. Sanderson*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a

---

**11.** This renders irrelevant plaintiff's counsels' observations concerning the qualifications of the plaintiffs in *Town:* when a court establishes a legal standard, as did the Court in *Town*, the fact that the plaintiff in that particular case was presumed to meet the standard, or that there was a disputed issue of material fact as to whether the standard was met in

that case, does not mean, *ipso facto*, all future plaintiffs will be similarly situated. Whether or not the individuals in that case were meeting their employers' legitimate expectations says nothing about whether Mr. Cicero met his. Unlike those plaintiffs, his deposition informs us that he did not.

case decided well after judgment had been entered Mr. Cicero's suit, the Supreme Court rejected the view of the *McDonnell–Douglas* tripartite burden shifting test established by many federal courts that required plaintiffs to proffer additional evidence in the third step beyond that provided in the *prima facie* case. How this case is relevant to the sanctions discussion is entirely unclear, other than in support of the vague, generalized, and unremarkable notion that there can be changes in case law concerning employment discrimination. The issues raised in *Reeves,* however, were not present in Mr. Cicero's case, as there was no requirement imposed upon him to produce such additional evidence.

Similarly inapposite is the Sixth Circuit's opinion in *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651 (6th Cir.2000). In *Cline,* the court held that is was improper in a sex discrimination case for a court to grant summary judgment at the *prima facie* step of the analysis where there was a material issue of disputed fact as to whether an employer's asserted legitimate "qualification," was, in fact, a qualification for the position. In that case, an otherwise well-performing pregnant schoolteacher at a Catholic school was discharged, allegedly for having engaged in pre-marital sexual relations, as evidenced by her pregnancy. The court held that there was a disputed issue of material fact as to whether the teacher had been discharged for the state of her pregnancy, which would have been illegal (and provides an excellent example of an illegitimate expectation by an employer), or for her pre-marital sexual activity, which would have been a lawful discharge, and that a reasonable jury could conclude that either was the case on the basis of the facts presented at summary judgment. In stark contrast, Mr. Cicero presented no such question as to whether his employer's

expectations—which he concedes he did not meet—were legitimate or were, in fact, the actual expectations. If Mr. Cicero's position were to be analogous to that presented in *Cline,* he would have had to present evidence of a factual dispute as to whether a particular qualification asserted by BWA in litigation had really been expected of him during his employment, such as an unperformed duty that was never mentioned to him or that was not suggested by his job description.

Moreover, *Cline* establishes that the qualification issue in the *prima facie* case is to be determined by the employee's performance prior to the event purportedly precipitating his discharge. Though in Mr. Cicero's case there was not a mere single event or deficiency connected to his discharge, but rather a long-term cumulative dissatisfaction by BWA with his performance, the fact is that at no point during his employment with BWA was Mr. Cicero meeting BWA's expectations—a fact both perceived by him and explained to him in each of his three annual evaluations. In other words, Mr. Cicero did not present a *prima facie* case that he was meeting BWA's legitimate expectations during those two-and-a-half years; rather, he presented evidence only that he continued to be employed by BWA during that time and that he was repeatedly not meeting those expectations. The plaintiff in *Cline* would not have survived summary judgment for failure to make out a *prima facie* case if, instead of presenting the contested pregnancy v. premarital sex qualification issue, she had testified, Cicero-like, that over two-and-a-half years she had antagonized her principle and the school board by refusing to teach required subjects, used teaching methods that were forbidden by school policy, failed to meet school targets for student proficiency, and hired a teaching assistant without consult-

ing her superiors or in violation of an explicit order not to do so. The "qualification" requirement of the *prima facie* case may be a low threshold, but it is not nonexistent, and there are many cases, such as Mr. Cicero's, where the standard has obviously not been met.

### 3. "Pattern" v. "Statistical" Evidence of Discrimination

Citing *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054 (8th Cir.1988) and *Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985), plaintiff's counsel make their most colorable argument in response to the show cause order—namely, that there is case authority for the proposition that a "pattern" of discrimination using small numbers of people may be admissible even where such sample sizes are of no statistical relevance. While the broad proposition—that such cases exist—may be true, they are once again irrelevant to Mr. Cicero's case.

First, the court notes that neither of theses cases was presented in plaintiff's briefs in response to the summary judgment motion, even though defendants heavily addressed the statistical issue in their briefs, and even though both cases had been on the books for more than a decade. Indeed, as noted in the court's opinion, plaintiff provided in his briefs no legal response to this argument whatsoever. However, the court again notes that an attorney's choice of which arguments to respond to does not establish the reasonableness of his conduct;[12] the state of the law at the time of the litigation does.

Second, whatever the attractiveness to plaintiffs of the Eighth Circuit's broad proposition in *MacDissi* that "there is no minimal sample size prescribed in federal law," that assertion is untrue in the Sixth Circuit, as amply demonstrated by the Sixth Circuit citations from the past decade contained in this court's opinion granting summary judgment. More to the point, however, is that even accepting the "pattern" argument at face value as presented in *MacDissi* and *Lenz,* it is of no relevance to Mr. Cicero's factual position. In both *MacDissi* and *Lenz,* the "pattern" evidence was admissible because the respective plaintiffs had proffered other, independent evidence that the employers' asserted justifications for termination were pretextual as to the plaintiffs, and the "patterns" of termination of other employees, though few in number, was relevant because plaintiffs proffered evidence of pretext as to those other terminations as well.

Mr. Cicero's case was not in a factual posture comparable to the cited cases; as discussed in this court's summary judgment opinion, he did not actually challenge the factual validity of BWA's difficulties with his performance (with one immaterial exception). Nor did he provide facts concerning the performance of the other terminated individuals whom he now claims were part of a "pattern." Hence, in the absence of evidence concerning the circumstances of those individuals, mere numbers cannot be "pattern" evidence within the meaning of *MacDissi* and *Lenz.* There was no factual contest on the issue of pretext that might provide an inference of illegality concerning the other terminations. In fact, the record was devoid of any information that might have enabled a trier of fact to evaluate the legitimacy of the other three terminations (had plaintiff's counsel even chosen to pursue this line of argument). In short, Mr. Cicero's assertion of age discrimination rested on nothing more than the existence of a statistically insignificant group of four men who lost their

---

12. Presumably, such a choice reflects the attorney's informed professional judgment.

jobs and who were over the age of 40 at the time of their terminations. He did not make a "pattern" argument, and there was no evidence that would have supported such an argument had it been made.

## C. The Relevance of Settlements

■ Plaintiff's counsel make much of the fact that other BWA employees, who were terminated contemporaneously with Mr. Cicero, and who were represented by them, received settlements from BWA. The settlement of these cases, counsel argue, demonstrates that Mr. Cicero's claims, at the very least, were not without merit. This argument is facile. Settlements occur for any number of reasons. It may be that a plaintiff's claims are entirely valid, and the defendant may recognize that fact and feel compelled to compensate for its wrongdoing. At the other end of the spectrum, a defendant may consider a plaintiff's claims to be utterly frivolous, but recognize that a settlement will likely be cheaper than litigating the matter to finality. And there are sundry explanations for settlements in between these two extremes. Indeed, it would appear that BWA would have been financially better off if Mr. Cicero had accepted its last settlement offer of approximately $69,000, despite there being no evidence of illegality on its part, given that it incurred approximately $70,000 in direct legal expenses from defending itself in this case (which does not include other costs to the company such as document searches and lost employee time for depositions).

Courts provide individualized justice. That other cases involving other employees of the same employers may have settled provides no information or insight about the merits of Mr. Cicero's case. It is entirely possible that those cases were as frivolous as Mr. Cicero's, but that the plaintiffs were willing to settle for an amount less than BWA's likely costs of litigation.[13] It is also entirely possible that those individuals were discriminated against, and that BWA avoided needless litigation by paying what was due. By counsel's logic, the failure to settle Mr. Cicero's case is just as easily proof of its frivolity; otherwise it would have been settled like the others. Many things are possible, but the fact is that neither the court nor plaintiffs counsel have any concrete notions as to why BWA settled other cases and not this one. Mr. Cicero's case must stand or fall on its own merits, and not on speculation as to what other unlitigated cases might have proven.

## D. Conduct During Discovery

Plaintiff's counsel also suggest that their conduct, and that of their client, should not be subject to sanctions because of their high degree of candor in this case. Specifically, they note that Mr. Cicero forthrightly admitted his performance deficiencies in his deposition, and that plaintiff's counsel turned over to defense counsel Mr. Cicero's supervisor's written evaluation of him during discovery. As they (correctly) note, they were professionally obligated to do. This argument meets the mark, in part: counsel and client's adherence to the minimum expectations of truthful and forthright participation in discovery is certainly relevant to the court's evaluation of bad faith, and tends to support an inference that there was no bad faith in the suit's prosecution.

But meeting the minimum standards of candor in discovery does not fully indicate whether counsel's behavior was unreasonable in light of the information developed during its course, and it is that issue that

---

**13.** As a general matter, it bears repeating that the frequency of such economically-induced behavior by defendants does not in any way make the prosecution of such suits by counsel any more legally or ethically justifiable.

is the primary subject of the court's inquiry. The standard for sanctions is not an either/or proposition. It is not the case that only blatantly illegal, unethical, or contumacious conduct is sanctionable; it is the case that the most severe and probable sanctions will be imposed under such circumstances. Here, the primary question is whether a client's and his attorney's actions were reasonable in light of their specific knowledge at the time decisions were made.[14]

### E. Mr. Cicero's Conduct

■■■■ The court harbors doubts as to the reasonableness of Mr. Cicero's conduct in filing this suit, particularly in light of his extensive experience in human resource management. As frustrating as termination of one's employment and the resulting financial hardship may be, anger does not justify filing a discrimination lawsuit where there is every reason to believe that no unlawful discrimination occurred. Nonetheless, Mr. Cicero did consult with at least two attorneys prior to filing suit, is likely unable to pay any significant sanction, and there appears to be no reason to believe that he will file any such suits in the future. Given that the primary purpose of Rule 11 sanctions is deterrence and not compensation, and that the court has made no findings of bad faith, no sanctions will be imposed upon Mr. Cicero.

### IV. Conclusion

Parties in litigation often resemble a train that is speeding to meet a scheduled stop. Concerns of timeliness must be carefully balanced with the requirements for safety, lest the train pick up so much speed that it runs off the tracks. Counsel, as their own conductors, must take care to balance zest with prudence. While ethical and professional duties demand zealousness on behalf of his client, an attorney must remember that, as an officer of the court, he is relied upon as the first line of defense against claims that are utterly lacking in merit, whether legal or factual.

There is no doubt that counsel in the instant case represented the plaintiff professionally and competently. But at some point during this lawsuit, counsel's case came off the tracks. As the litigation progressed, counsel failed to recognize that the record provided absolutely no support for the client's cause of action.

Put in simplest form, there came a point during the discovery process of this employment discrimination suit in which the evidence conclusively showed that the plaintiff did not meet his employer's legitimate expectations prior to his termination. That evidence came from plaintiff's own sworn testimony, and was further buttressed by his allied witnesses and documents. Plaintiff was therefore unable to produce a *prima facie* case. Had such unequivocal evidence been derived from sources other than the plaintiff (which it also was here), he would have been unable to prove that the reasons for his dismissal

14. Unrelatedly, plaintiff's counsel suggest, via Mr. Dubin's Affidavit, that the court's address of plaintiff's arguments in its summary judgment opinion somehow validates their merit. The inference is unwarranted. The court believes itself duty-bound, within the constraints of its resources, to evaluate all of plaintiff's claims. It is not the practice of this court, or of any other that it is aware of, to issue opinions only addressing meritorious arguments, and to dispense with explanations of why frivolous claims are terminated. Counsel and clients have a right to know the reasons why their claims will stand or fall. Notwithstanding Mr. Dubin's conclusion, the court took ten pages to explain that plaintiff's arguments assertedly providing evidence of pretext were either factually or legally irrelevant in order that their irrelevancy might be fully understood, not because they were meritorious.

were pretextual. In either event, the acquisition of such one-sided facts obligated plaintiff's counsel to advise their client to dismiss the suit or to withdraw as his counsel if he refused. Looking at the facts of Mr. Cicero's situation, no reasonable person could have concluded that his age played any part in the decision to terminate him.

Although employment discrimination law is not legally complicated, it is very fact-intensive. But numerosity of facts does not excuse counsel from viewing them in the light of common sense and everyday experience. Amassing factual irrelevancies and embroidering them with a weave of inapposite case law does not turn a sow's ear into a silk purse, no matter how able or experienced counsel is. Volume is no substitute for merit.

When, as happened here, an attorney's client testifies under oath that he was not doing his job, it is time to end the suit. There is no shame or unprofessionalism in doing so; it is required. This court thinks that counsel have a continuing obligation to reflect on the merits of a suit, and when a claim or position becomes obviously untenable, the correct measure is to stop advocating it. Meritorious advocacy must not be chilled, but neither should meritlessness be approved.

It may be that the high volume of employment discrimination suits has inured a significant portion of the bar to the cases that are truly frivolous. Even if such suits have become customary, they are still forbidden. Not only are frivolous suits wasteful, expensive, and meddlesome to the immediate participants, they prevent plausible discrimination claims from being timely heard, and dissuade those who have actually been wronged from filing suit because of the inordinate length of time it would take to obtain a remedy. Justice delayed is justice denied.

It is the court's expectation that counsel litigating employment discrimination suits in this district will not only concern themselves with the details required to move their cases forward, but meet their continuing obligation to exercise comprehensive judgment as to whether the facts adduced can reasonably be expected to support the legal claims made. The legal and ethical obligations of the bar demand no less.

Accordingly,

IT IS ORDERED that pursuant to Fed. R.Civ.P. 54(d), plaintiff Thomas L. Cicero is to PAY defendants $10,140.05 in compensation for their costs incurred in this litigation, along with interest accruing as of November 23, 1999.[15]

IT IS FURTHER ORDERED that no sanctions will be imposed upon either plaintiff Thomas L. Cicero or his counsel.

---

**15.** The parties are encourage to work out an acceptable rate of interest and an appropriate payment schedule.